WEST SIDE TENNIS CLUB, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 83338.    Promulgated January 20, 1939.

*Lawrence A. Baker, Esq.*, for the petitioner.
*Clay C. Holmes, Esq.*, for the respondent.

OPINION.

DISNEY: The Revenue Acts of 1932 and 1934 exempt from taxation:

Clubs organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder. [Sec. 103 (9), 1932 Act; sec. 101 (9), 1934 Act.]

The applicable provisions of the statute must be strictly construed and the petitioner had the burden of showing clearly that it comes within their terms. *Waynesboro Manufacturers Association,* 1 B. T. A. 911; *Farmers' Co-Operative Milk Co.,* 9 B. T. A. 696; *Northwestern Drug Co.,* 14 B. T. A. 222. The purpose for which a club was organized may be within the statute, but if it is not operated exclusively for nonprofitable purposes or if part of its net earnings inure to the benefit of a private shareholder, the statute does not operate to give exemption from tax. *The Associates,* 28 B. T. A. 521; *The Jockey Club,* 30 B. T. A. 670; *Farmers Union Co-Operative Co.* v. *Commissioner,* 90 Fed. (2d) 488. Under the statute a corporation may be exempt even though it derives earnings as an incident to its general nonprofitable purpose. *Trinidad* v. *Sagrada Orden de Predicadores,* 263 U. S. 578; *Roche's Beach, Inc.* v. *Commissioner,* 96 Fed. (2d) 776; *Santee Club* v. *White,* 87 Fed. (2d) 5. In the *Santee Club* case it was said that "The purpose for which the corporation, if otherwise exempt, engaged in the transaction in question is the test." The profit realized from an isolated sale is not exempt from tax if the transaction, instead of being merely incidental to the activities of the club, was entered into with gain as the primary object in view. *Juniper Hunting Club, Inc.,* 28 B. T. A. 525. In *Jockey Club* v. *Helvering,* 76 Fed. (2d) 597, affirming

*The Jockey Club, supra,* the court, in discussing the meaning of identical provisions of 1926 and 1928 Acts, said:

  \*   \*   \*   This does not of course mean that a club may on no occasion make a profit without losing its exemption, but it does mean that the returns from transactions with outsiders, taken by and large, shall be no more than a reimbursement of their cost to the club; shall not be a source of income. If it turns out upon computation that they are such a source over a substantial enough period to justify the conclusion that this is deliberate, we agree with the Board that the club is making earnings which "inure to the benefit" of the members, though they are not distributed.   \*   \*   \*

The respondent does not contend that the petitioner was not organized for purposes within the statutes. He argues that it was not operated exclusively for pleasure, recreation, and other nonprofitable purposes and that part of its net earnings inured to the benefit of its members. He points to the profits realized from major tennis tournaments to show that during the taxable years a part of the activities of petitioner were deliberately entered into for profitable purposes. The petitioner argues that the profits derived from tournaments awarded to it by the Association were in connection with "an activity clearly incidental to and in furtherance of the essential purpose of an otherwise exempt social club" and that the activity is "directly related to and in keeping with the objects" for which it was organized and has been exclusively operated.

In 1923 the petitioner and the Association were in agreement that the facilities then in use at the club for accommodating all who desired to witness the matches were not only inadequate but were of such a nature as to cause considerable inconvenience to members each year for about three months and damage to the grounds. Committees were appointed by each to consider the existing condition at petitioner's club. Their action resulted in a contract under the terms of which the Association awarded petitioner a major tennis tournament each year for ten years, subject to the construction by it on its grounds of a permanent stadium of a specified seating capacity and an agreement for dividing the net proceeds of the matches. Upon the termination of the agreement in 1933, another contract, with similar provisions, was entered into for a like period.

The petitioner claims that these tournaments stimulated interest among its members to use the normal facilities of the club and had the effect of retaining membership and encouraging others to join. It claims that this is the primary purpose it had in seeking awards of major tennis tournaments from the Association and that the continuation of the attraction over a long period of time is not enough to make the undertaking a business. A purpose of that nature, when properly limited, may not carry a club, otherwise exempt, into the field of taxation. There was no such limitation here as we view the facts.

The financial result of tournaments held prior to 1933 is not in evidence, but upon brief the petitioner admits that, with the exception of 1917, when a small loss was sustained, and in 1918, when no event was held, since 1914 the matches resulted in net profits each year. By 1923 the petitioner had had sufficient experience in conducting major tournaments awarded to it by the Association to be able to predict with a reasonable degree of certainty the financial outcome of any like events held in the future. With this knowledge in its possession, in that year it provided permanent facilities to continue the venture for ten years and then sought, and received, an award of matches for a like term. The stadium erected under the plan to hold major tournaments annually for ten years has a permanent seating capacity considerably in excess of the temporary stands previously used each year, and the agreement with the Association was to make provision for increasing the normal capacity about 50 percent, or to more than twice the seating capacity of the temporary stands. This action of the petitioner is strong evidence of a desire at least to be in a position to offer to the Association for many additional years adequate facilities for holding major championship matches at terms to be agreed upon.

The members of the club were obliged to forego some of the facilities of petitioner during the tournaments. It is apparent that the tournaments were not an activity conducted solely for the benefit of the membership of the club, but rather to their inconvenience, and the rule set forth in G. C. M. 2867, C. B. VII-1, p. 115, cited by the petitioner, may not be applied here. In view of the small membership of the club in comparison with the attendance at the matches, the petitioner's new venture was of such an extent and the financial burden so large that it was obviously necessary to draw upon the general public for most of the patronage to avoid risk of large deficits. Support by outsiders was received.

The major matches held at the stadium in each of the taxable years under an award of the Association resulted in profits, substantially all of which were derived from outsiders in the form of admission fees and from sources characterized in the report of petitioner's treasurer as catering and parking. It was not necessary for an applicant for admission to the tournaments, in order to be in a position to qualify as a spectator, to manifest the same interest in tennis or the normal social and recreational activities of the club which was requisite to membership. The only requirement was that he present a ticket for admission in the same manner as is required in any other form of public entertainment.

Considering the admission that the activity in question was conducted over a long period at a profit and facts of record, there is

justification for holding, and we do hold, that the tournaments were deliberately entered into for profit. If profits were not the primary object in view, steps would have been taken, after many years of profitable operation as a guide, to fix prices for permission to witness the matches that would not have resulted in profit from outside sources.

The petitioner cites *Trinidad* v. *Sagrada Orden de Predicadores*, *supra*, to support its contention. There, as we pointed out in *The Associates*, *supra*, the Supreme Court considered the benefit the public derived from the activity and the " 'beneficent purpose of Congress' in allowing exemption to charitable organizations." The public received no benefit from the income derived from the tournaments. In 1933 the earnings were sufficient to offset a deficit in normal club operations and leave about $8,500 as a credit to surplus. In 1934 the profit of about $11,000 from the tournament operations was less than the loss from other activities, but the amount served to reduce the deficit. In each year the earnings were used to pay debts of petitioner.

We are unable to distinguish the present proceeding in principle from *Jockey Club* v. *Helvering*, *supra*. Therein the corporation was vitally interested in the improvement of the breed of horses and expended large sums upon, and obviously contributed materially to, that laudable objective. It received substantial income from various sources such as fees from registrations, fees for issuance of licenses, fines and penalties, percentages of prize moneys, etc. These characteristics prevented the allowance of a claim of exemption from tax. Yet the Jockey Club did not own, lease, or operate race tracks; whereas herein the petitioner does own, operate, and derive profit from, a stadium, an institution somewhat analogous to a race track. See also *Uniform Printing & Supply Co.* v. *Commissioner*, 33 Fed. (2d) 445; certiorari denied, 280 U. S. 591. Under the circumstances present here, it can not be said that the earnings did not inure to the benefit of petitioner's members even though they were not distributed.

We conclude that the petitioner has failed to establish its right to exemption and accordingly sustain the action of the respondent in holding it to be subject to tax.

The petitioner contends in the alternative that the amounts it collected for dues and initiation fees do not constitute taxable income on the ground that they represent capital contributions. The revenue was reported as income in returns filed for the taxable years, and there is no indication in the record that the petitioner ever entered the amounts in his books as capital items. Neither does it appear that the petitioner was denied the use of the income for general operating purposes. In *The Jockey Club*, *supra*, the tax of 10 percent

on dues paid by members had been paid to the collector of internal revenue for a number of years. The amounts in question represent taxable income of the petitioner. *The Jockey Club, supra; Pontiac Employees Mutual Benefit Association*, 15 B. T. A. 74; *United Retail Grocers Association*, 19 B. T. A. 1016.

The respondent imposed a 25 percent penalty for petitioner's failure to file returns within the time prescribed by law. The Revenue Acts of 1932 and 1934 provide for a penalty equal to 25 percent of the tax in cases, as here, where the return is filed after the due date thereof unless "it is shown that the failure to file it was due to reasonable cause and not due to willful neglect * * *." Sec. 291.

The evidence before us on the issue is limited to facts set forth in the stipulation. These are merely that prior to 1934 petitioner's officers and directors believed that it was exempt from payment of Federal income taxes. Thereafter, at some undisclosed date, the petitioner received a notice from the Commissioner that he considered it subject to payment of income taxes, and on August 2, 1935, the petitioner filed returns for the taxable years accompanied by claims for exemption.

The respondent does not claim that petitioner willfully neglected to file timely returns for the taxable years, but contends that its failure in that regard was not due to reasonable cause. We have said that the term "reasonable cause" used in the statute means "such a cause as would prompt an ordinarily intelligent and prudent business man to have so acted under similar circumstances." *Charles E. Pearsall & Son*, 29 B. T. A. 747. We do not know the steps taken by petitioner to ascertain its status as a taxpayer and, without knowledge of the basis for the belief of its officers and directors that it was exempt from tax, we are in no position to test the reasonableness of the conclusion. We can only speculate on the reason for the belief and such speculation would not in the final analysis help petitioner's cause. Nothing more than belief that one is not required to file a return is not enough to discharge the penalty. *Eagle Piece Dye Works*, 10 B. T. A. 1360; *Rafael Sabatini*, 32 B. T. A. 705; affd., 98 Fed. (2d) 753, in which the court said: "The taxpayer may well have believed that he was liable for no tax and yet have had no reasonable cause for not filing timely returns."

In *The Jockey Club*, supra, relied upon by the petitioner, the taxpayer filed blank returns within the time prescribed by law and claimed exemption. We think that feature of the case is sufficient to distinguish it from the instant proceeding.

The respondent committed no error in imposing the 25 percent penalty for failure to file timely returns.

*Decision will be entered for the respondent.*